# United States Court of Appeals
# for the Fifth Circuit

United States Court of Appeals
Fifth Circuit

**FILED**

June 20, 2025

Lyle W. Cayce
Clerk

————————

No. 24-30706

————————

Darcy Roake, Reverend, on behalf themselves and *on behalf of their minor children*, real party in interest A.V., real party in interest S.V.; Adrian Van Young, *on behalf of themselves and on behalf of their minor children*, real party in interest A.V., real party in interest S.V.; Mamie Broadhurst, Reverend, *on behalf of themselves and on behalf of their minor child*, real party in interest N.W.; Richard Williams, Reverend, *on behalf of themselves and on behalf of their minor child*, real party in interest N.W.; Jeff Sims, Reverend, *on behalf of himself and on behalf of his minor children*, real party in interest A.S., real party in interest C.S. 1, real party in interest C.S. 2; Jennifer Harding, *on behalf of themselves and on behalf of their minor child*, real party in interest A.O.; Benjamin Owens, *on behalf of themselves and on behalf of their minor child*, real party in interest A.O.; David Hawley, *on behalf of themselves and on behalf of their minor children* real party in interest A.H., real party in interest L.H.; Erin Hawley, *on behalf of themselves and on behalf of their minor children*, real party in interest A.H, real party in interest L.H.; Dustin McCrory, *on behalf of themselves and on behalf of his minor children*, real party in interest E.M.; real party in interest P.M., real party in interest L.M.; Gary Sernovitz, *on behalf of themselves and on behalf of their minor child*, real party in interest T.S.; Molly Pulda, *on behalf of themselves and on behalf of their minor child*. real party in interest T.S.; Christy Alkire, *on behalf of herself and on behalf of her minor child*, real party in interest L.A.; Joshua Herlands, *on behalf of himself and on behalf of his minor children*, real party in interest E.H., real party in interest J.H.,

*Plaintiffs—Appellees*,

*versus*

Cade Brumley, *in his official capacity as the Louisiana State Superintendent of Education*; Conrad Appel, *in his official capacity as a member of the Louisiana State Board of Elementary and Secondary Education (LSBESE)*; Judy Armstrong, *in her official capacity as a member of the LSBESE*; Kevin Berken, *in his official capacity as a member of the LSBESE*; Preston Castille, *in his official capacity as a member of LSBESE*; Simone Champagne, *in her official capacity as a member of the LSBESE*; Sharon Latten-Clark, *in her official capacity as a member of the LSBESE*; Lance Harris, *in his official capacity as a member of LSBESE*; Paul Hollis, Louisiana State Board of Elementary and Secondary Education; Sandy Holloway, *in her official capacity as a member of the LSBESE*; Stacey Melerine, *in her official capacity as a member of the LSBESE*; Ronnie Morris, *in his official capacity as a member of the LSBESE*; East Baton Rouge Parish School Board; Livingston Parish School Board; Vernon Parish School Board; St. Tammany Parish School Board,

*Defendants—Appellants.*

_____

Appeal from the United States District Court
for the Middle District of Louisiana
USDC No. 3:24-CV-517

_____

Before Dennis, Haynes, and Ramirez, *Circuit Judges*.
Irma Carrillo Ramirez, *Circuit Judge*:

Parents and students challenge a statute requiring public schools to permanently display the Ten Commandments in every classroom in Louisiana. The district court found the statute facially unconstitutional and preliminarily enjoined its enforcement. We AFFIRM.

No. 24-30706

I

A

The Louisiana governor signed House Bill 71, Act. No. 676 (H.B. 71) into law in June 2024. In pertinent part, it provides:

> (1) No later than January 1, 2025, each public school governing authority shall display the Ten Commandments in each classroom in each school under its jurisdiction. The nature of the display shall be determined by each governing authority with a minimum requirement that the Ten Commandments shall be displayed on a poster or framed document that is at least eleven inches by fourteen inches. The text of the Ten Commandments shall be the central focus of the poster or framed document and shall be printed in a large, easily readable font.

> (2) The text shall read as follows:

> " The Ten Commandments
> I AM the LORD thy God.
> Thou shalt have no other gods before me.
> Thou shalt not make to thyself any graven images.
> Thou shalt not take the Name of the Lord thy God in vain.
> Remember the Sabbath day, to keep it holy.
> Honor thy father and thy mother, that thy days may be long upon the land which the Lord thy God giveth thee.
> Thou shalt not kill.
> Thou shalt not commit adultery.
> Thou shalt not steal.
> Thou shalt not bear false witness against thy neighbor.
> Thou shalt not covet thy neighbor's house.
> Thou shalt not covet thy neighbor's wife, nor his manservant, nor his maidservant, nor his cattle, nor anything that is thy neighbor's."

La. R.S. § 17:2124(B)(1)–(B)(2).

No. 24-30706

The Ten Commandments[1] must be displayed with a "context statement" about the "History of the Ten Commandments in American Public Education,"[2] and "may" be displayed with "the Mayflower Compact, the Declaration of Independence, and the Northwest Ordinance." *Id.* § 17:2124(B)(3)–(B)(4). Public school governing authorities are not required to pay for the displays. Instead, they can "accept donated funds to purchase the displays" or "accept donated displays." *Id.* § 17:2124(B)(5). H.B. 71 tasks the Louisiana Board of Elementary and Secondary Education

_____

[1] Plaintiffs' complaint alleges that H.B. 71 adopts a Protestant version of the Ten Commandments. Their expert agreed: "[I]t is my expert opinion that the version of the Ten Commandments adopted under H.B. 71 is Protestant and *not* nondenominational." Louisiana offered no rebuttal.

[2] The "context statement" reads:

The Ten Commandments were a prominent part of American public education for almost three centuries. Around the year 1688, *The New England Primer* became the first published American textbook and was the equivalent of a first grade reader. *The New England Primer* was used in public schools throughout the United States for more than one hundred fifty years to teach Americans to read and contained more than forty questions about the Ten Commandments.

The Ten Commandments were also included in public school textbooks published by educator William McGuffey, a noted university president and professor. A version of his famous *McGuffey Readers* was written in the early 1800s and became one of the most popular textbooks in the history of American education, selling more than one hundred million copies. Copies of the *McGuffey Readers* are still available today.

The Ten Commandments also appeared in textbooks published by Noah Webster in which were widely used in American public schools along with America's first comprehensive dictionary that Webster also published. His textbook, *The American Spelling Book*, contained the Ten Commandments and sold more than one hundred million copies for use by public school children all across the nation and was still available for use in American public schools in the year 1975.

*Id.* § 17:2124(B)(3).

No. 24-30706

(BESE) with adopting rules and regulations to ensure the statute's "proper implementation." *Id.* § 17:2124(B)(6)(a). H.B. 71 also applies to postsecondary institutions. *See id.* § 17:2124(C)(1).

H.B. 71 includes several legislative findings and a declaration of legislative intent, which, in relevant part, provide:

> (4) Recognizing the historical role of the Ten Commandments accords with our nation's history and faithfully reflects the understanding of the founders of our nation with respect to the necessity of civic morality to a functional self-government. . . .

> (5) Including the Ten Commandments in the education of our children is part of our state and national history, culture, and tradition.

> (6) The text of the Ten Commandments set forth in Subsection B of this Section is identical to the text of the Ten Commandments monument that was upheld by the Supreme Court . . . in *Van Orden v. Perry*, 545 U.S. 677, 688 (2005). . . . .

> (9) It is the Legislature's intent to apply the decision set forth by the Supreme Court . . . in *Van Orden v. Perry*, 545 U.S. 677 (2005), to continue the rich tradition and ensure that the students in our public schools may understand and appreciate the foundational documents of our state and national government.

*Id.* § 17:2124(A)(4)–(A)(9).

## B

On June 24, 2024, a group of multi-faith and non-religious Louisiana parents[3] brought suit on their own behalf (Parents) and on behalf of their

---

[3] Plaintiffs subscribe to a wide range of religious and non-religious views including Unitarian Universalism, Judaism, Reform Judaism, Presbyterian Christianity, atheism, non-religiousness, and agnostic atheism. Plaintiffs allege that the Protestant version of the

No. 24-30706

minor children (Students) (collectively, Plaintiffs), challenging the constitutionality of H.B. 71 under the Establishment Clause and Free Exercise Clause of the First Amendment. They sued Cade Brumley, who is the Louisiana State Superintendent of Education (Superintendent), several BESE members in their official capacities, and five parish school boards (collectively, Louisiana).[4] After filing their complaint, Plaintiffs moved for preliminary injunctive relief, and proffered the expert report of Dr. Steven K. Green, a law professor and constitutional and religious historian. Dr. Green's report concluded that there is no evidence of a longstanding historical tradition of permanently displaying the Ten Commandments in public school classrooms.

Louisiana moved to exclude Dr. Green's expert testimony, moved to dismiss the complaint under Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6), opposed the preliminary injunction, and alternatively moved to stay the injunction pending appeal. It argued that Plaintiffs' claims were unripe, Plaintiffs lacked standing, and the Superintendent and the BESE-member defendants were entitled to sovereign immunity, and it challenged the merits of Plaintiffs' First Amendment claims.

––––––––––––––––––––––––

Ten Commandments set out in H.B. 71 differs from the version observed by most adherents of the Catholic and Jewish faiths. They further allege that many other religions do not regard the commandments as part of their belief system at all.

[4] Plaintiffs sued East Baton Rouge Parish School Board, Livingston Parish School Board, Vernon Parish School Board, St. Tammany Parish School Board, and Orleans Parish School Board. Because Orleans Parish School Board is not a party to this appeal and independently moved to dismiss the complaint and opposed the preliminary injunction before the district court, "Louisiana" refers to all the defendants, excluding the Orleans Parish School Board. We held the Orleans Parish School Board's appeal in abeyance pending our resolution of this appeal. *See* Abeyance Order, *Orleans Par. Sch. Bd. v. Brumley*, No. 24-30779 (5th Cir. Dec. 19, 2024), Dkt. No. 11.

No. 24-30706

After a hearing, the district court denied Louisiana's motions and issued a preliminary injunction. The preliminary injunction prohibited Louisiana from enforcing H.B. 71.[5] The court also ordered the Superintendent and the BESE-member defendants to provide notice of its ruling to all Louisiana public schools.

Louisiana appeals the entry of a preliminary injunction and the denial of its motion to dismiss and motion to exclude Plaintiffs' expert testimony.

II

This court has jurisdiction to review "final decisions" under 28 U.S.C. § 1291 and interlocutory orders under 28 U.S.C. § 1292(a)(1). A preliminary injunction is an appealable interlocutory order. *See* 28 U.S.C. § 1292(a)(1). Ordinarily, the denial of a motion to dismiss is not an appealable final decision under § 1291 as it is "neither a ruling on the merits nor an effective termination of all or any discrete part of the district court proceedings." *Save the Bay, Inc. v. U.S. Army*, 639 F.2d 1100, 1103 (5th Cir. 1981) (per curiam). "But to the extent the underpinnings of [Louisiana's] motion [to dismiss] are inextricably intertwined with the district court's subsequent rulings challenged on appeal, . . . we have jurisdiction to address those issues." *Jiao v. Xu*, 28 F.4th 591, 596 (5th Cir. 2022).

Louisiana opposed the preliminary injunction on the same grounds asserted in its motion to dismiss, and the district court ruled on the motions simultaneously. Accordingly, we have jurisdiction over those rulings.

---

[5] Because H.B. 71 would have gone into effect on January 1, 2025, La. R.S. § 17:2124(B)(1), if the preliminary injunction were vacated, the statute would go into effect immediately.

No. 24-30706

III

Louisiana challenges the denial of its motion to dismiss for lack of subject matter jurisdiction, contending that the district court lacked subject matter jurisdiction based on ripeness, standing, and sovereign immunity.

We review the denial of a motion to dismiss for lack of subject matter jurisdiction *de novo. Ramming v. United States*, 281 F.3d 158, 161 (5th Cir. 2001) (per curiam). Plaintiffs, as "the party asserting jurisdiction," bear the burden of proof. *Id.*

A

"A court should dismiss a case for lack of 'ripeness' when the case is abstract or hypothetical." *Orix Credit All., Inc. v. Wolfe*, 212 F.3d 891, 895 (5th Cir. 2000) (quoting *New Orleans Pub. Serv., Inc. v. Council of New Orleans*, 833 F.2d 583, 586–87 (5th Cir. 1987)). To assess ripeness, courts evaluate "(1) 'the fitness of the issues for judicial decision[,]' and (2) 'the hardship to the parties of withholding court consideration.'" *Braidwood Mgmt., Inc. v. Equal Emp. Opportunity Comm'n*, 70 F.4th 914, 930 (5th Cir. 2023) (quoting *Abbott Lab'ys v. Gardner*, 387 U.S. 136, 149 (1967), *abrogated on other grounds by Califano v. Sanders*, 430 U.S. 99 (1977)).

1

On the first prong, "a claim is 'fit for judicial decision' if it presents a pure question of law that needs no further factual development." *Braidwood Mgmt.*, 70 F.4th at 930 (citing *New Orleans Pub. Serv.*, 833 F.2d at 586–87). This means that a claim is ripe so long as it is not "contingent [on] future events that may not occur as anticipated, or indeed may not occur at all." *Book People, Inc. v. Wong*, 91 F.4th 318, 333 (5th Cir. 2024) (alteration in original) (quoting *Braidwood Mgmt.*, 70 F.4th at 930).

No. 24-30706

Louisiana is wrong that further factual development is needed in this case. Citing *Staley v. Harris County*, 485 F.3d 305 (5th Cir. 2007) (en banc), Louisiana argues that Plaintiffs' claims are not fit for judicial decision because Plaintiffs have not yet encountered an H.B. 71 poster—they do not know what any given display will look like, what context may accompany the Ten Commandments, or where in any specific classroom a display may be placed. *Staley* provides no support.

*Staley* concerned the constitutionality of a monument displaying a Christian Bible at a county courthouse in Texas. 485 F.3d at 307. A panel of this court held that displaying the monument violated the Establishment Clause, but days before the case would be reheard en banc, the courthouse placed the monument in storage. *Id.* Our en banc court held that "any dispute over a probable redisplay of the . . . monument [was] not ripe because there [were] no facts before [it] to determine whether such a redisplay might violate the Establishment Clause." *Id.* at 309. "In the absence of this evidence," the en banc court determined it was "unable to conduct the fact-intensive and context-specific analysis" required in Establishment Clause jurisprudence. *Id.*

Plaintiffs' lawsuit targets H.B. 71's minimum requirements, which reflect "when, where, or under what circumstance[s]" the Ten Commandments are to be displayed. *Id.* at 307.

- *What will be displayed*? "The text of the Ten Commandments"—the exact Protestant version of which is provided by the statute, La. R.S. § 17:2124(B)(1)–(B)(2);

- *How will it be displayed*? As "the *central focus*" of a "poster or framed document that is *at least* eleven inches by fourteen inches," and "*printed in a large, easily readable font*," along with a "context

statement," also provided by the statute, *id.* § 17:2124(B)(1), (B)(3) (emphases added);

- *When will it be displayed?* "No later than January 1, 2025," and for the duration of the entire school year, *id.* § 17:2124(B)(1);

- *Where will it be displayed?* In every Louisiana public school classroom, regardless of class subject matter, student age, or student grade, somewhere that it can be seen by students,[6] *id;*

- *Why will it be displayed?* Purportedly for historical reasons, *see id.* § 17:2124(A)(9).

This case is not like *Staley* where "*no* decision ha[d] been made regarding *any aspect* of the future display of the [stored] monument." 485 F.3d at 309 (emphases added). The text of H.B. 71 provides sufficient information for a fact-intensive and context-specific analysis. Plaintiffs' claims are fit for judicial decision; the first ripeness prong is satisfied.

2

On the second ripeness prong, Plaintiffs have shown hardship should we withhold court consideration.

"The Supreme Court has found hardship to inhere in legal harms, such as the harmful creation of legal rights or obligations; practical harms on

---

[6] Notably, Louisiana does not suggest that there is a possibility that the displays may not be seen by students. During oral argument, Louisiana argued that "there is a fundamental difference between, for example, an 11-inch by 14-inch poster in the back corner of a classroom, and an 11-foot by 14-foot poster in the front wall of the classroom." To "display" something means "to place or spread (something) for people to see." *Display*, Merriam-Webster Dictionary, https://perma.cc/955S-KS6N. Because H.B. 71 requires that the Ten Commandments be "display[ed]" in each classroom and "be printed in a large, easily readable font," La. R.S. § 17:2124(B)(1), the statutory text dictates that the posters be placed within students' view.

No. 24-30706

the interests advanced by the party seeking relief; and the harm of being 'force[d] . . . to modify [one's] behavior in order to avoid future adverse consequences.'" *Choice Inc. of Tex. v. Greenstein*, 691 F.3d 710, 715 (5th Cir. 2012) (alterations in original) (quoting *Texas v. United States*, 497 F.3d 491, 499 (5th Cir. 2007)). Whether the challenged statute or regulation "inflicts significant practical harm upon the interests that [Plaintiffs] advance[]" is "an important consideration." *Ohio Forestry Ass'n v. Sierra Club*, 523 U.S. 726, 733–34 (1998).

Here, Plaintiffs allege that the displays violate their rights under the First Amendment's Establishment Clause. "The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Elrod v. Burns*, 427 U.S. 347, 373 (1976). Absent judicial intervention, Louisiana will implement H.B. 71. As a result, Students will be subjected to displays that accord with the statute's minimum display requirements, in every classroom during every school day. H.B. 71 therefore inflicts significant practical harm on Plaintiffs' First Amendment rights. *See id*; *Espinoza v. Mont. Dep't of Revenue*, 591 U.S. 464, 486 (2020) (recognizing "the rights of parents to direct 'the religious upbringing' of their children" (quoting *Wisconsin v. Yoder*, 406 U.S. 205, 213–14 (1972))). Plaintiffs have demonstrated that there is hardship in withholding consideration sufficient to "justify judicial intervention." *See Pearson v. Holder*, 624 F.3d 683, 684 (5th Cir. 2010) ("[T]he ripeness inquiry focuses on whether an injury that has not yet occurred is sufficiently likely to happen to justify judicial intervention." (alteration in original) (citation omitted)); *Braidwood Mgmt.*, 70 F.4th at 931–32 ("[L]itigants are entitled to relief where they '"remain under a constant threat" that government officials will use their power' to enforce the law against them. Therefore, plaintiffs' claims are ripe." (footnote omitted)).

Plaintiffs' claims are ripe; the district court did not err.

No. 24-30706

B

Louisiana next challenges whether Plaintiffs have standing to press their Establishment Clause claim, focusing on the injury-in-fact element.

To establish Article III standing, a plaintiff must show "an injury in fact" that is "fairly traceable to the challenged action" and "redress[able] by a favorable decision." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992) (citation modified). The injury-in-fact element "ensure[s] that the plaintiff has a 'personal stake in the outcome of the controversy.'" *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158 (2014) (quoting *Warth v. Seldin*, 422 U.S. 490, 498 (1975)). Accordingly, "an injury must be 'concrete, particularized, and actual or imminent.'" *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013) (citation omitted).[7]

1

Louisiana's argument that Plaintiffs lack standing to press their Establishment Clause claims is two-fold: First, it argues that in cases involving religious displays, allegations of future encounters are insufficient for purposes of establishing standing. Second, citing non-binding, minority-view Supreme Court opinions, it contends that the "offended observer

_____

[7] Although Louisiana only challenges this element, we must still ensure the other standing requirements are satisfied. *See Lujan*, 504 U.S. at 559 ("[The Constitution] limits the jurisdiction of federal courts to 'Cases' and 'Controversies.'"). The district court found that Plaintiffs' alleged injuries were traceable to the action of each defendant because the BESE-member defendants are required to "adopt rules and regulations . . . to ensure the proper implementation" of H.B. 71, La. R.S. § 17:2124(B)(6)(a), and the Superintendent is required to "[i]mplement the policies and programs of the board and the laws affecting schools under the jurisdiction of the board," *id.* § 17:22(3). The district court found redressability because "it is highly likely" that Plaintiffs' alleged injuries would be remedied by an injunction prohibiting the display of the Ten Commandments as required by H.B. 71 and implementation of rules regarding the displays. We find no error.

No. 24-30706

standing" doctrine is "profoundly wrong" and urges that we overturn our "offended observer" precedent. We address each argument in turn.

a

i

Parts of the Ten Commandments include basic principles regarding criminal conduct that are part of a civilized society, such as the prohibition against murder. However, they come from religious texts and include commandments that have clear religious import, such as requiring worship of one God and keeping the Sabbath holy. Their display in public school classrooms, as required by H.B. 71, qualifies as a religious display.

Unwanted exposure to government-sponsored religious displays and exercises can, under certain circumstances, violate a plaintiff's First Amendment rights. *See, e.g.*, *Lynch v. Donnelly*, 465 U.S. 668 (1984) (examining the constitutionality of a Nativity scene displayed in a shopping center during the holiday season); *County of Allegheny v. Am. C.L. Union Greater Pittsburgh Chapter*, 492 U.S. 573, 598–602 (1989) (permanently enjoining a county from displaying a Nativity scene in the county courthouse, but permitting a menorah to be displayed outside of a county building), *abrogated on other grounds by Town of Greece v. Galloway*, 572 U.S. 565 (2014); *Santa Fe Indep. Sch. Dist. v. Doe*, 530 U.S. 290 (2000) (holding unconstitutional student-led and student-initiated prayer announced over the speaker system before football games). Because "government speech must comport with the Establishment Clause," *Pleasant Grove City v. Summum*, 555 U.S. 460, 468 (2009), "Establishment Clause injury can occur when a person encounters the Government's endorsement of religion." *Moore v. Bryant*, 853 F.3d 245, 250 (5th Cir. 2017); *see e.g.*, *Murray v. City of Austin*, 947 F.2d 147, 151–52 (5th Cir. 1991) (finding standing to challenge religious insignia where plaintiff encountered insignia on utility bill); *Freedom

13

No. 24-30706

*From Religion Found., Inc. v. Mack*, 49 F.4th 941, 949–50 (5th Cir. 2022) (finding standing where plaintiff had an "ongoing confrontation" with prayer ceremony in courtroom).

Confrontation with a religious display or exercise satisfies the injury-in-fact requirement of standing only if the plaintiff can "identify [a] personal injury suffered by [the plaintiff] *as a consequence* of the alleged constitutional error." *Valley Forge Christian Coll. v. Ams. United for Separation of Church & State, Inc.*, 454 U.S. 464, 485 (1982); *see Barber v. Bryant*, 860 F.3d 345, 353 (5th Cir. 2017) ("A plaintiff has standing to challenge a religious display where his stigmatic injury results from a 'personal[] confront[ation]' with the display." (alterations in original) (citation omitted)). This means that alleging a confrontation, alone, is insufficient. Naked allegations that the Constitution has been violated are also insufficient. *Valley Forge*, 454 U.S. at 485–86. Rather, in Establishment Clause cases, the injury is being "personally exposed" to a *government's* religious message "with which [a plaintiff] disagrees, or . . . has had to assume a burden to avoid." Carl H. Esbeck, *Unwanted Exposure to Religious Expression by Government: Standing & the Establishment Clause*, 7 Charleston L. Rev. 607, 633 (2013); *id.* at 637 ("A conflict between belief and message is the basis of adversity between plaintiff and her government where the basic problem is government taking sides on a religious question."); *see e.g.*, *Sch. Dist. of Abington Twp. v. Schempp*, 374 U.S. 203, 211–12, 224 n.9 (1963) (atheist family and Unitarian family had standing to challenge statute requiring that the Holy Bible and Lord's Prayer be read at the start of school day); *Lee v. Weisman*, 505 U.S. 577, 599 (1992) ("The sole question presented is whether [under the Establishment Clause] a religious exercise may be conducted at a graduation ceremony in circumstances where . . . young graduates who object are induced to conform."). And in the public school context, a government's injurious religious message "carr[ies] a particular risk of indirect coercion."

No. 24-30706

*Lee*, 505 U.S. at 592; *Sch. Dist. of City of Grand Rapids v. Ball*, 473 U.S. 373, 383 (1985) (discussing "the sensitive relationship between government and religion in the education of our children" and noting that "[t]he government's activities in this area can have a magnified impact on impressionable young minds"), *overruled on other grounds by Agostini v. Felton*, 521 U.S. 203 (1997).

ii

"An allegation of future injury may suffice [to satisfy Article III] if the threatened injury is certainly impending, or there is a substantial risk that the harm will occur." *Driehaus*, 573 U.S. at 158 (internal quotation marks and citation omitted); *accord. Babbitt v. United Farm Workers Nat'l. Union*, 442 U.S. 289, 298 (1979) ("But '[o]ne does not have to await the consummation of threatened injury to obtain preventive relief. If the injury is certainly impending, that is enough.'" (alteration in original) (quoting *Pennsylvania v. West Virginia*, 262 U.S. 553, 593 (1923), *aff'd*, 263 U.S. 350 (1923))); *Clapper*, 568 U.S. at 409 ("[W]e have repeatedly reiterated that 'threatened injury must be *certainly impending* to constitute injury in fact . . . .'"); *Dep't of Com. v. New York*, 588 U.S. 752, 767 (2019) (holding States had standing to bring action based on "primarily future injuries"); *FDA v. All. for Hippocratic Med.*, 602 U.S. 367, 381 (2024) ("Moreover, the injury must be actual or imminent . . . meaning that the injury must have already occurred *or be likely to occur soon*." (emphasis added)). So, too, can allegations of future confrontations satisfy the injury-in-fact element of standing. This is particularly true when a plaintiff seeks prospective relief. *See All. for Hippocratic Med.*, 602 U.S. at 381.

In *School District of Abington Township v. Schempp*, the Supreme Court invalidated two statutes requiring that Bible verses be read to students over the school's intercommunications system at the start of every school day. 374

15

No. 24-30706

U.S. 203. Students were "asked to stand and join in repeating the prayer in unison," but could excuse themselves either by stepping out of the classroom or simply not participating upon a parent's written request. *Id.* at 207. Finding that the plaintiffs had standing to challenge the statutes under the Establishment Clause, the Supreme Court said:

> It goes without saying that the laws and practices involved here can be challenged only by persons having standing to complain. . . . The parties here are school children and their parents, who are directly affected by the laws and practices against which their complaints are directed. These interests surely suffice to give the parties standing to complain.

*Id.* at 224 n.9 (citations omitted). The Court explained that "[t]he plaintiffs in *Schempp* had standing, not [merely] because their complaint rested on the Establishment Clause . . . but because impressionable schoolchildren were subjected to unwelcome religious exercises or were forced to assume special burdens to avoid them." *Valley Forge*, 454 U.S. at 486 n.22; *see also Lee*, 505 U.S. at 584 (finding a "live and justiciable controversy" based on an alleged future injury where the plaintiff challenging a policy permitting clergy members to pray during middle and high school graduations was enrolled at a school where it was "likely, if not certain, that an invocation and benediction [would] be conducted at . . . graduation").

We have previously held that a plaintiff need not wait for "actual implementation of [a] statute" or an "actual violation[] of his rights" to seek relief. *Ingebretsen v. Jackson Pub. Sch. Dist.*, 88 F.3d 274, 278 (5th Cir. 1996). *Ingebretsen* involved a pre-implementation challenge to a Mississippi statute permitting "student-initiated voluntary prayer" during school-related student events under the Establishment Clause. *Id.* at 277–78 (citation omitted). Rejecting Mississippi's argument that the plaintiff lacked standing because the statute had not yet been implemented, we held that "[t]here

No. 24-30706

[was] no need for [the plaintiff] to wait for actual implementation of the statute and actual violations of his rights under the First Amendment where the statute 'makes inappropriate government involvement in religious affairs inevitable.'" *Id.* (citing *Karen B. v. Treen*, 653 F.2d 897, 902 (5th Cir. 1981), *aff'd*, 455 U.S. 913 (1982)); *see also Barber*, 860 F.3d at 357 (" Future injuries can provide the basis for standing, but they 'must be certainly impending to constitute injury in fact[.]'").[8]

Louisiana argues that *Staley* and *Doe v. Tangipahoa Parish School Board*, 494 F.3d 494 (5th Cir. 2007) (en banc), overturned *Ingebretsen*, so Plaintiffs must supply proof of an actual encounter with an H.B. 71 display to establish standing. At the outset, we note that Louisiana does not grapple with *Schempp*—a future injury case where the Supreme Court found standing to press an Establishment Clause claim. Nevertheless, *Staley* and *Doe* are both distinguishable and neither decision purported to overturn *Ingebretsen*, so *Ingebretsen* remains good law.

*Staley* addressed mootness and ripeness—not standing. *See* 485 F.3d at 309. *Doe* involved a challenge to a school board's practice of opening its meetings with a prayer. *Doe v. Tangipahoa Par. Sch. Bd.*, 473 F.3d 188, 191 (5th Cir. 2006), *rev'd en banc*, 494 F.3d 494 (5th Cir. 2007). We held that the plaintiff, whose sons attended schools under the board's jurisdiction, lacked

---

[8] Louisiana cites *Barber* for the proposition that, in religious display cases, this court has "required an encounter with the offending item or action to confer standing." *See* 860 F.3d at 353. But the quoted language cannot be divorced from its accompanying context. *Barber* involved a Mississippi statute prohibiting any discriminatory action against persons who acted in accordance with certain beliefs listed in a subsection of the bill. *Id.* at 350–51. This court held that the plaintiffs lacked standing because " [t]he beliefs listed in that section exist only in the statute itself." *Id.* at 354. We even distinguished the plaintiffs' injuries from those alleged in religious display cases, concluding that " religious-display cases [did] not provide a basis for standing to challenge the endorsement of beliefs that exist only in the text of a statute." *Id.*

standing to challenge the invocations because even after a trial on the merits, there was insufficient proof in the record that he or his sons had been exposed to the invocations. 494 F.3d at 497. *Doe* was not a pre-implementation facial challenge, and the issue was not whether the plaintiffs *would be* injured by the prayers if they were to occur in the future. Instead, the allegedly injurious invocations *had occurred* "since at least 1973," 473 F.3d at 192, but the plaintiffs had not proven that they had ever witnessed them or would in the future. *See* 494 F.3d at 497–98.

The precedents of the Supreme Court and this court establish that, in an Establishment Clause case, a plaintiff can generally satisfy the injury-in-fact element of standing when he experiences—or certainly will experience—unwanted exposure to government-sponsored religious displays or exercises in the course of his regular activities. *See Schempp*, 374 U.S. at 224 n.9; *Lee*, 505 U.S. at 584; *Ingebretsen*, 88 F.3d at 277–78.

iii

Here, H.B. 71 requires that the Ten Commandments be permanently displayed in every classroom of every public elementary, middle, and high school in Louisiana. Under Louisiana's compulsory education laws, students must attend school for at least 177 days per year, La. R.S. § 17:154.1(A)(1), and legal guardians must "assure the attendance of the[ir] child[ren] in regularly assigned classes during regular school hours" or be fined or imprisoned, *id.* § 17:221(A)(1)(b)–(A)(1)(c). If H.B. 71 goes into effect,[9] impressionable Students will confront a display of the Ten Commandments for nearly every hour of every school day of their public school education in the course of their regular activities. Plaintiffs allege that H.B. 71's version of

---

[9] Absent a preliminary injunction, H.B. 71 would currently be in effect. *See id.* § 17:2124(B)(1).

No. 24-30706

the Ten Commandments is contrary to the religious and non-religious beliefs they hold. H.B. 71 does not provide a means for students to avoid the displays or avoid unwanted exposure to a government-sponsored religious display. Students have shown standing. *See Schempp*, 374 U.S. at 211–12, 224 n.9; *Lee*, 505 U.S. at 599.

Parents have likewise pleaded an injury-in-fact sufficient to confer standing to assert their Establishment Clause claims. Because of Students' regular exposure with the H.B. 71 displays, Parents are "directly affected" by the challenged statute. *Schempp*, 374 U.S. at 224 n.9; *see Fleischfresser v. Dirs. of Sch. Dist. 200*, 15 F.3d 680, 684 (7th Cir. 1994) (holding that parents have standing to allege an Establishment Clause claim where an "impermissible establishment of religion might inhibit their right to direct the religious training of their children"); *Steele v. Van Buren Pub. Sch. Dist.*, 845 F.2d 1492, 1495 (8th Cir. 1988) (holding plaintiff's claim remained in controversy because she had a "parental interest in having her children educated in a public school free of religious activities").

We find no error in the district court's ruling that Plaintiffs demonstrated standing to assert their Establishment Clause claims.

b

Louisiana contends that Plaintiffs cannot establish "offended observer standing," as characterized by non-binding, minority-view Supreme Court opinions. It nevertheless urges us to reconsider our "offended observer" precedents in light of *Kennedy v. Bremerton School District*, 597 U.S. 507 (2022), which overruled the test announced in *Lemon v. Kurtzman*, 403 U.S. 602 (1971), for assessing Establishment Clause

No. 24-30706

claims,[10] and because the doctrine is "profoundly wrong."[11] Louisiana's arguments fail at the threshold.

i

The Supreme Court has never expressly and formally recognized "offended observer standing" in a majority opinion; this term appears only in non-binding minority opinions. *See City of Ocala v. Rojas*, 143 S. Ct. 764 (2023) (Mem.) (Gorsuch, J., statement regarding denial of certiorari) (Thomas, J., dissenting from denial of certiorari); *Am. Legion v. Am. Humanist Ass'n*, 588 U.S. 29, 79–89 (2019) (Gorsuch, J., concurring in the judgment); *Espinoza*, 591 U.S. at 495 (Thomas, J., concurring). In a concurrence, one of the Supreme Court's members has stated that under the "offended observer" standing theory, "offense *alone* qualifies as a 'concrete and particularized' injury sufficient to confer standing" and it therefore has no basis in law. *Am. Legion*, 588 U.S. at 80 (Gorsuch, J., concurring in the judgment) (emphasis added);[12] *see also City of Ocala*, 143 S. Ct. at 767

---

[10] In *Kennedy*, the Supreme Court declared that it had "long ago abandoned *Lemon* and its endorsement test offshoot." *See* 597 U.S. at 534.

[11] *See Post*, at 1–4 (Dennis, J., concurring).

[12] The *American Legion* concurrence argues,

Lower courts invented offended observer standing for Establishment Clause cases in the 1970s in response to . . . *Lemon v. Kurtzman*, 403 U.S. 602 (1971). *Lemon* held that whether governmental action violates the Establishment Clause depends on its (1) purpose, (2) effect, and (3) potential to "excessive[ly] . . . entangl[e]" church and state, a standard [the] Court came to understand as prohibiting the government from doing anything that a "reasonable observer" might perceive as "endorsing" religion. And lower courts reasoned that, if the Establishment Clause forbids anything a reasonable observer would view as an endorsement of religion, then such an observer must be able to sue. Here alone, lower

No. 24-30706

(Thomas, J., dissenting from denial of certiorari) ("In every other area, we have been clear that 'offense alone [is] insufficient to convey standing.'" (citation omitted)).

Plaintiffs allege more than "offense alone," however. As noted, if H.B. 71 goes into effect, Students will be subjected to unwelcome displays of the Ten Commandments for the entirety of their public school education. There is no opt-out option. Plaintiffs are not mere bystanders who have "fail[ed] to identify any personal injury suffered by them *as a consequence* of the alleged constitutional error, other than the psychological consequence presumably produced by observation of conduct with which [they] disagree[]." *Valley Forge*, 454 U.S. at 485; *see id.* at 486 n.22 ("The plaintiffs in *Schempp* had standing . . . because impressionable schoolchildren were subjected to unwelcome religious exercises or were forced to assume special burdens to avoid them."). Nor are Plaintiffs asking the courts to redress "'generalized grievances' about the conduct of Government." *See Am. Legion*, 588 U.S. at 80 (Gorsuch, J., concurring in the judgment) (citation omitted) (opining that "[o]ffended observer standing is deeply inconsistent" with the rule that "'generalized grievances' . . . are insufficient to confer standing"). They allege that Students "will be pressured to observe, meditate on, venerate, and follow this scripture and to suppress expression of their own religious beliefs and backgrounds at school." Indeed, the Supreme Court has recognized that "there are heightened concerns with protecting freedom of conscience from subtle coercive pressure in the elementary and secondary public schools." *Lee*, 505 U.S. at 592.

_____

courts concluded . . . an observer's offense must "suffice to make an Establishment Clause claim justiciable."

*Id.* at 84 (second alteration in original) (citations and quotation marks omitted).

No. 24-30706

Plaintiffs are more than mere "offended observers." Students and Parents will be "directly affected" by H.B. 71; this is sufficient to confer standing. *Schempp*, 374 U.S. at 224 n.9.

ii

Louisiana notably does not specify the precedent it asks us to reconsider based on *Kennedy*.

Under our court's rule of orderliness,[13] *Kennedy* is not an intervening change in relevant law, because it did not examine or even mention standing. In that case, a school district suspended and later fired a high school football coach for praying on the school football field after games. The coach sued the district under the Free Exercise and Free Speech Clauses. 597 U.S. at 519–23. The school district invoked the Establishment Clause as a defense to the coach's Free Exercise and Free Speech claims, arguing that his Free Exercise rights were "in 'direct tension'" with its obligations under the Establishment Clause pursuant to "*Lemon* and its progeny." *Id.* at 532, 534. The Supreme Court rejected the district's argument, set aside *Lemon*, and clarified that "the Establishment Clause must be interpreted by 'reference to historical practices and understandings.'" *Id.* at 535 (quotation marks omitted). Because it was primarily a Free Exercise Clause and Free Speech Clause challenge, *Kennedy* does not provide an appropriate basis upon which we may reconsider our Establishment Clause standing caselaw. *See Collins v. Dep't of the Treasury*, 83 F.4th 970, 985 (5th Cir. 2023) (concluding that a Supreme Court decision was not an intervening change in Appropriations Clause law "because it was not an Appropriations Clause case"). And "[a]s middle-

---

[13] "It is a well-settled Fifth Circuit rule of orderliness that one panel of our court may not overturn another panel's decision, absent an intervening change in the law, such as by . . . the Supreme Court, or our en banc court." *Jacobs v. Nat'l Drug Intel. Ctr.*, 548 F.3d 375, 378 (5th Cir. 2008).

No. 24-30706

management circuit judges, we must follow binding precedent." *Consumers' Rsch. v. Consumer Prod. Safety Comm'n*, 91 F.4th 342, 346 (5th Cir. 2024), *cert. denied*, 154 S. Ct. 414 (2024).[14]

C

Louisiana next argues that the Superintendent and the BESE-member defendants are entitled to sovereign immunity. It contends that the *Ex parte Young*[15] exception to sovereign immunity is inapplicable here because (1) there must be a direct threat of enforcement against the plaintiffs to find an ongoing violation of federal law in a pre-enforcement challenge like this one, and (2) these defendants lack the requisite enforcement authority over H.B. 71.

"Generally, States are immune from suit under the terms of the Eleventh Amendment and the doctrine of sovereign immunity." *Whole Woman's Health v. Jackson*, 595 U.S. 30, 39 (2021). "This bar also applies to suits like this one 'against state officials or agencies that are effectively suits against a state.'" *Book People*, 91 F.4th at 334 (quoting *City of Austin v. Paxton*,

—————————————

[14] Because Plaintiffs have standing under the Establishment Clause, we do not reach Louisiana's arguments regarding whether Plaintiffs have standing to press their Free Exercise Clause claims. *See Sherbert v. Verner*, 374 U.S. 398, 410 (1963) (declining to reach plaintiff's equal protection claim "[i]n view of the result [the Court] reached under the First and Fourteenth Amendment's guarantee of free exercise of religion"); *see also e.g.*, *Espinoza*, 591 U.S. at 488–89 & n.5 (finding Free Exercise violation; declining to reach Establishment Clause and Equal Protection claims); *Flast v. Cohen*, 392 U.S. 83, 104 n.25 (1968) (finding standing to press Establishment Clause claim; declining to reach Free Exercise claim); *Masterpiece Cakeshop, Ltd. v. Colo. C.R. Comm'n*, 584 U.S. 617 (2018) (finding Free Exercise violation; declining to reach Free Speech claim); *First Nat'l Bank of Bos. v. Bellotti*, 435 U.S. 765, 774 n.8 (1978) (finding First Amendment violation; declining to reach Equal Protection claim); *League of United Latin Am. Citizens v. Perry*, 548 U.S. 399, 442 (2006) (finding Voting Rights Act violation; declining to reach First Amendment and Equal Protection claims).

[15] *Ex parte Young*, 209 U.S. 123 (1908).

No. 24-30706

943 F.3d 993, 997 (5th Cir. 2019)). Under the *Ex parte Young* exception to sovereign immunity, " a litigant may sue a state official in his official capacity if the suit seeks prospective relief to redress an ongoing violation of federal law." *Williams ex rel. J.E. v. Reeves*, 954 F.3d 729, 736 (5th Cir. 2020) (citing *Ex parte Young*, 209 U.S. at 167–68).

The Supreme Court has warned that " a court need only conduct a '*straightforward* inquiry into whether [the] complaint alleges an ongoing violation of federal law and seeks relief properly characterized as prospective.' " *Verizon Md., Inc. v. Pub. Serv. Comm'n of Md.*, 535 U.S. 635, 645 (2002) (alteration in original) (emphasis added). The ongoing and continuous violation of federal law requirement " merely distinguishes between cases where the relief sought is prospective in nature, . . . and cases where relief is retrospective." *Summit Med. Assocs., P.C. v. Pryor*, 180 F.3d 1326, 1338 (11th Cir. 1999). It " does not mean that the enforcement of the allegedly unconstitutional state statute actually must be in progress against the particular plaintiffs initiating suit." *Id.* Rather, " the *Ex parte Young* analysis turns on the complaint's context," that is, "whether 'the state officer, by virtue of his office, has some connection with the enforcement of the act.' " *Air Evac EMS, Inc. v. Tex., Dep't of Ins., Div. of Workers' Comp.*, 851 F.3d 507, 519 (5th Cir. 2017) (citing *Ex parte Young*, 209 U.S. at 157); *see id.* (rejecting defendants' argument that the *Ex parte Young* exception did not apply because the challenged action was not enforced against the plaintiff, noting the correct inquiry was " whether state defendants [had] the requisite connection to the enforcement of the [challenged action]" ).

" To satisfy the required enforcement connection, the state official must have a duty beyond 'the general duty to see that the laws of the state are implemented.' " *Book People*, 91 F.4th at 335 (citation omitted). " We have defined 'enforcement' as 'compulsion or constraint,'" such that "[i]f the official does not compel or constrain anyone to obey the challenged law,

enjoining that official could not stop any ongoing constitutional violation." *Id.* (alteration in original) (quoting *City of Austin*, 943 F.3d at 1002). "Plaintiffs need only show a 'scintilla of enforcement by the relevant state official.'" *Id.* (quoting *Tex. Democratic Party v. Abbott*, 978 F.3d 168, 179 (5th Cir. 2020)).

H.B. 71 commands the BESE to "adopt rules and regulations . . . to *ensure* [its] proper implementation." La. R.S. § 17:2124(B)(6)(a) (emphasis added). Louisiana argues that this obligation does not amount to enforcement power because the possibility that the BESE may someday promulgate rules and regulations is insufficient to invoke *Ex parte Young. See Whole Woman's Health*, 595 U.S. at 44 (holding that the possibility that the Texas Medical Board "might in the future" promulgate a rule that the attorney general could enforce was insufficient to invoke *Ex parte Young*). But the BESE is not merely *permitted* to adopt rules and regulations implementing H.B. 71, it *must* do so. La. R.S. § 17:2124(B)(6)(a) ("The [BESE] *shall* adopt rules and regulations in accordance with the Administrative Procedure Act to ensure the proper implementation of this Section." (emphasis added)).

Louisiana also argues that the BESE's exercise of its authority to implement H.B. 71 will not compel or constrain anyone to obey the challenged law. *See Book People*, 91 F.4th at 335. We disagree because the rules and regulations adopted by the BESE must "ensure [H.B. 71's] proper implementation," meaning the BESE-member defendants will necessarily compel "each public school governing authority [to] display the Ten Commandments in each classroom in each school under its jurisdiction." La. R.S. § 17:2124(B)(6)(a), (B)(1). And under state law, the Superintendent must "implement the policies and programs of the [BESE] and the laws affecting schools under the jurisdiction of the [BESE]." *Id.* § 17:22(3)–(4). As the district court concluded: "[A]n injunction against the

No. 24-30706

Superintendent would prevent the implementation of any regulations related to H.B. 71, thus preventing constitutional violations."

All that our caselaw requires is a "scintilla of enforcement." *Book People*, 91 F.4th at 335. The district court ruled that Plaintiffs met their burden; we find no error.

IV

Louisiana next challenges the denial of its Rule 12(b)(6) motion to dismiss Plaintiffs' Establishment Clause claims.[16]

We review the denial of a motion to dismiss for failure to state a claim *de novo. Ramming*, 281 F.3d at 161. "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).[17]

The parties agree that Plaintiffs have asserted a facial challenge to H.B. 71. "To successfully mount a facial challenge, the plaintiffs must show that there is no set of circumstances under which [H.B. 71] is constitutional." *Croft v. Perry*, 624 F.3d 157, 164 (5th Cir. 2010).

---

[16] Because we do not address whether Plaintiffs have standing to press their Free Exercise Claims, *see supra* note 14, we do not reach Louisiana's arguments regarding these claims. *See Sinochem Int'l Co. v. Malaysia Int'l Shipping Corp.*, 549 U.S. 422, 430–31 (2007) ("[A] federal court generally may not rule on the merits of a case without first determining that it has . . . subject matter jurisdiction[] . . . ." (citation omitted)).

[17] As noted, because the "underpinnings" of Louisiana's motion to dismiss are "inextricably intertwined" with the district court's ruling issuing a preliminary injunction, we have jurisdiction to address the 12(b)(6) ruling. *See Jiao*, 28 F.4th at 596.

No. 24-30706

A

The Establishment Clause "was intended to erect 'a wall of separation between Church and State.'" *Everson v. Bd. of Educ. of Ewing Twp.*, 330 U.S. 1, 16 (1947) (quoting *Reynolds v. United States*, 98 U.S. 145, 164 (1878)). At a minimum, the Establishment Clause ordains that no federal or state government "can pass laws which aid one religion, aid all religions, or prefer one religion over another." *Id.* at 15.

The Supreme Court "has been particularly vigilant in monitoring compliance with the Establishment Clause in elementary and secondary schools." *Edwards v. Aguillard*, 482 U.S. 578, 583–84 (1987). That vigilance must be exercised with prescribed "care and restraint" because public education is primarily in the hands of the States and local authorities. *Epperson v. Arkansas*, 393 U.S. 97, 104 (1968); *see Yoder*, 406 U.S. at 213 ("Providing public schools ranks at the very apex of the function of a State."). This means "[c]ourts . . . cannot intervene in the resolution of conflicts which arise in the daily operation of school systems and which do not directly and sharply implicate basic constitutional values." *Epperson*, 393 U.S. at 104. For still, "a State's interest in universal education, however highly we rank it, is not totally free from a balancing process when it impinges on fundamental rights and interests, such as those specifically protected by . . . the First Amendment, and the traditional interest of parents with respect to the religious upbringing of their children." *Yoder*, 406 U.S. at 214.

The protections afforded to schoolchildren by the Establishment Clause unquestionably "implicate basic constitutional values." *Epperson*, 393 U.S. at 104. As the Court has previously explained:

> Families entrust public schools with the education of their children, but condition their trust on the understanding that the classroom will not purposely be used to advance religious views that may conflict with the private beliefs of the student

No. 24-30706

and his or her family. Students in such institutions are impressionable and their attendance is involuntary. The State exerts great authority and coercive power through mandatory attendance requirements, and because of the students' emulation of teachers as role models and the children's susceptibility to peer pressure. Furthermore, "[t]he public school is at once the symbol of our democracy and the most pervasive means for promoting our common destiny. In no activity of the State is it more vital to keep out divisive forces than in its schools. . . ."

*Edwards*, 482 U.S. at 584 (alterations in original) (citations omitted). That is why a religious practice may be deemed unconstitutional in the "special context of the public elementary and secondary school system," but deemed constitutional elsewhere. *Id.* at 583.

Perhaps no better case illustrates the nature of H.B. 71's constitutional problem than *Stone v. Graham*, 449 U.S. 39 (1980) (per curiam). In *Stone*, the Supreme Court struck down a Kentucky statute requiring that the Ten Commandments be displayed on the wall of every public classroom in the state because it had no "secular legislative purpose." [18] 449 U.S. at 41 (applying *Lemon* test).

_____

[18] The statute read:

(1) It shall be the duty of the superintendent of public instruction, provided sufficient funds are available as provided in subsection (3) of this Section, to ensure that a durable, permanent copy of the Ten Commandments shall be displayed on a wall in each public elementary and secondary school classroom in the Commonwealth. The copy shall be sixteen (16) inches wide by twenty (20) inches high.

(2) In small print below the last commandment shall appear a notation concerning the purpose of the display, as follows: 'The secular application of the Ten Commandments is clearly seen in its adoption as the

No. 24-30706

According to Kentucky, the statute's secular legislative purpose was reflected on the displays in a small notation below the Commandments: "The secular application of the Ten Commandments is clearly seen in its adoption as the fundamental legal code of Western Civilization and the Common Law of the United States." *Id.* at 41. The Court held that the state's avowed purpose was a sham, and the statute was therefore unconstitutional. *Id.* It explained, "[t]he pre-eminent purpose for posting the Ten Commandments on schoolroom walls is plainly religious in nature. The Ten Commandments are undeniably a sacred text in the Jewish and Christian faiths, and no legislative recitation of a supposed secular purpose can blind us to that fact." *Id.* at 40–42 (footnote and citations omitted).

Instead of integrating the Ten Commandments "into [a] school curriculum[] where the Bible may . . . be used in an appropriate study," which the state could lawfully do, the posters "serve[d] no such educational function." *Id.* at 42 (citing *Schempp*, 374 U.S. at 225). Rather, "[i]f the posted copies of the Ten Commandments are to have any effect at all, it will be to induce the schoolchildren to read, meditate upon, perhaps to venerate and obey, the Commandments. . . . [That] is not a permissible state objective under the Establishment Clause." *Id.*

Twenty-five years after it decided *Stone*, the Supreme Court held in *Van Orden v. Perry*, 545 U.S. 677 (2005) (plurality opinion), that a monument

───────────────────────────

fundamental legal code of Western Civilization and the Common Law of the United States.'

(3) The copies required by this Act shall be purchased with funds made available through voluntary contributions made to the state treasurer for the purposes of this Act."

*Id.* at 39 n.1 (citing 1978 Ky. Acts, ch. 436, § 1 (effective June 17, 1978), Ky. Rev. Stat. § 158.178 (1980)).

29

of the Ten Commandments displayed on the Texas State Capitol grounds was constitutional under the Establishment Clause. The Court declined to apply the *Lemon* test—"[i]nstead, [its] analysis, [was] driven both by the nature of the monument and by our Nation's history." *Id.* at 686. It found that "[t]here is an unbroken history of official acknowledgment by all three branches of government of the role of religion in American life from at least 1789." *Id.* (citing *Lynch*, 465 U.S. at 674). It then found similar "acknowledgments of the role played by the Ten Commandments in our Nation's heritage." *Id.* at 688–90. Because "Texas ha[d] treated its Capitol grounds monuments as representing the several strands in the State's political and legal history," the Court "[could not] say that Texas'[s] display . . . violates the Establishment Clause." *Id.* at 691–92.

The Supreme Court noted, however, that "[t]here are, of course, limits to the display of religious messages or symbols." *Id.* at 690. It distinguished Texas's monument as a "far more passive use of [the Ten Commandments] than was the case in *Stone*, where the text confronted elementary school students every day." *Id.* at 691; *see also id.* at 703 (Breyer, J., concurring) ("The display is not on the grounds of a public school, where, given the impressionability of the young, government must exercise particular care in separating church and state.").

B

Louisiana argues that *Stone* is not controlling because it relies on *Lemon*, which is no longer good law, but even if *Stone* remains binding, it is distinguishable because (1) the displays in *Stone* stood alone, not alongside other documents as allowed by H.B. 71, and (2) Louisiana has a valid "secular historical and educational purpose" for displaying the Ten Commandments in classrooms. We disagree.

No. 24-30706

It is the Supreme Court's "prerogative alone to overrule one of its precedents." *Bosse v. Oklahoma*, 580 U.S. 1, 3 (2016) (per curiam) (quoting *United States v. Hatter*, 532 U.S. 557, 567 (2001)). The Court has been clear: When one of its precedents "has direct application in a case, yet appears to rest on reasons rejected in some other line of decisions, the Court of Appeals should follow the case which directly controls." *Rodriguez de Quijas v. Shearson/Am. Exp., Inc.*, 490 U.S. 477, 484 (1989).

Although the Supreme Court set aside the *Lemon* test in *Kennedy*, *see* 597 U.S. at 534–36, *Kennedy* did not overrule *Stone*. *Kennedy* does not mention *Stone* or purport to overrule the decisions (other than *Lemon*) on which *Stone* relies, i.e., *Schempp* or *Engel*. *Stone* remains good law and therefore controls, if it "direct[ly] appli[es]." [19] *Rodriguez de Quijas*, 490 U.S. at 484; *see Jusino v. Fed'n of Cath. Tchrs., Inc.*, 54 F.4th 95, 102 (2d Cir. 2022) (holding that *N.L.R.B. v. Cath. Bishop of Chi.*, 440 U.S. 490 (1979) "remains good law notwithstanding its reliance . . . on *Lemon v. Kurtzman*" because *Kennedy* did not "overrule – or even mention – *Catholic Bishop*"). We conclude that it does.

Both H.B. 71 and the Kentucky statute require that the Ten Commandments be displayed (1) in every public school classroom in the state (2) on a poster subject to comparable minimum size requirements (3) with context statements purporting to describe the historical basis for each display and (4) as the central focus of the display. Both statutes (5) allow the posters to be financed by private contributions, (6) task the superintendent with implementing its mandates, and neither statute (7) actually integrates the Ten Commandments into an educational curriculum. *Compare* La. R.S.

_____

[19] At least one other circuit has cited to *Stone* with approval post-*Kennedy*. *See Hilsenrath ex rel. C.H. v. Sch. Dist. of Chathams*, 136 F.4th 484, 492 n.65 (3rd Cir. 2025).

No. 24-30706

§ 17:2124(B), *with Stone*, 449 U.S. at 39 n.1 (citing `Ky. Rev. Stat.` § 158.178 (1980)).

Under H.B. 71, public schools "may" display the Ten Commandments alongside the Mayflower Compact, Declaration of Independence, and the Northwest Ordinance—they are not *required* do so. La. R.S. § 17:2124(B)(4)(a). Conversely, H.B. 71 includes an express "minimum requirement that the Ten Commandments *shall* be displayed on a poster or framed document that is at least eleven inches by fourteen inches," that "[t]he text of the Ten Commandments *shall* be the central focus" of the display, "and *shall* be printed in a large, easily readable font." *Id.* at § 17:2124(B)(1) (emphases added). An H.B. 71 display that meets the statute's minimum requirements is materially identical to the displays challenged in *Stone*.[20]

*Stone*'s reasoning is equally germane. In *Stone*, the Supreme Court deemed Kentucky's proffered secular purpose insufficient to survive constitutional muster because Kentucky did not integrate the Ten Commandments, an inherently religious text, into an educational curriculum "where the Bible may constitutionally be used in an appropriate study of history, civilization, ethics, comparative religion, or the like." 449 U.S. at 42 (citing *Schempp*, 374 U.S. at 225). Posting the Ten Commandments on classroom walls therefore "serve[d] no . . . educational function." *Id.* The

---

[20] Louisiana submitted twelve sample displays to the district court. These posters range in color, format, and subject matter. Some include the Ten Commandments alongside quotes and pictures of prominent figures like Speaker Mike Johnson, Justice Ruth Bader Ginsburg, Martin Luther King Jr., and Lin Manuel Miranda portraying Alexander Hamilton. The district court found that the samples fail to satisfy H.B. 71's minimum requirements because the Ten Commandments are not "printed in a large, easily readable font." We also note that the Ten Commandments are not the "central focus" of each display, and some displays include documents other than those permitted by H.B. 71.

same is true of H.B. 71. The statute does not require that the Ten Commandments be integrated into a curriculum of study. On the contrary, under the statute's minimum requirements, the posters must be indiscriminately displayed in every public school classroom in Louisiana regardless of class subject-matter. *See* La. R.S. § 17:2124(B)(1). Louisiana insists, however, that unlike Kentucky, its Legislature has a valid "secular historical and educational purpose" for displaying the Ten Commandments in classrooms, which is reflected in the statute.[21]

"Courts are 'normally deferential to a [legislative] articulation of a secular purpose.'" *Croft*, 624 F.3d at 166 (alteration in original) (quoting *Edwards*, 482 U.S. at 587). But an alleged secular purpose "must be 'sincere,'" and not "merely a 'sham.'" *Id.* (quoting *Wallace v. Jaffree*, 472 U.S. 38, 64 (1985) (Powell, J., concurring)). When "undertaking a 'sham' inquiry, we consider whether the challenged action furthers the particular purposes articulated by the legislature or whether the challenged action contravenes those avowed purposes." *Id.* (brackets omitted) (citing *Freiler v. Tangipahoa Par. Bd. of Educ.*, 185 F.3d 337, 344 (5th Cir. 1999)).

Louisiana's purported legislative purpose states:

It is the Legislature's intent to apply the decision set forth by the Supreme Court of the United States in *Van Orden v. Perry*, 545 U.S. 677 (2005), to continue the rich tradition [of including the Ten Commandments in the education of our children] and ensure that the students in our public schools may understand and appreciate the foundational documents of our state and national government.

La. R.S. § 17:2124(A)(9).

---

[21] We do not undertake this analysis to revive *Lemon*, but only for the limited purpose of deciding whether *Stone*'s facts and reasoning control.

No. 24-30706

Plaintiffs allege H.B. 71's legislative history reveals additional signs of a "sham" legislative purpose:

- H.B. 71's primary author and sponsor stated during a legislative debate: "It is so important that our children learn what God says is right, and what he says is wrong, and to allow [the Ten Commandments] to be displayed in our classrooms as a visual aid, I believe, especially in this day and time is so important."[22]

- In support of the bill, a co-author of the bill stated, "I really believe that we are lacking in direction. A lot of people, their children, are not attending churches . . . . We need to do something in the schools to bring people back to where they need to be." Debate, at 15:17.

- H.B. 71's primary author also stated, "You know, not all children . . . are taught right from wrong. . . . But I believe when I went to school, I learned . . . to know there was a God by reciting the Ten Commandments . . . . I knew what God said was right, and what he said was wrong, . . . not all of us were taught that." Debate, at 15:55.

- When asked how a Buddhist or Muslim student would interpret one of the Commandments, the bill's author responded, "Well I'm not Buddhist or Muslim so I'm not really worried about defining it for them. . . . [The Ten Commandments] [are] a model for what's God—it's God's law, and it's universal law." Debate, at 19:42.

- Another co-author and co-sponsor of H.B. 71 expressed his support for the law during debate by claiming that those who oppose it are waging an "attack on Christianity" and suggesting that it would

_____

[22] An Act Requiring the Display of the Ten Commandments in Public Schools, H.B. 71, 2024 Reg. Sess. (La. 2024), at 05:08, https://house.louisiana.gov/H_Video/VideoArchivePlayer?v=house/2024/apr/0404_24_ED [Debate].

provide a religious counterbalance to students' secular education: "My wife is a Christian and if she was a teacher she would be asked to teach evolution which is in complete contradiction with the theory of creation that we believe out of the Bible. . . . I am a parent and am asking for this [bill]."

Citing these statements, the district court found that Louisiana's avowed secular purposes were "implausible [and] inadequate." *See Croft*, 624 F.3d at 167 (citation modified). These statements indeed "support a commonsense conclusion that a religious objective permeated the government's action." *Id*; *see Edwards*, 482 U.S. at 591–92 (concluding that the "preeminent purpose of the [state legislature] was clearly to advance [a] religious viewpoint" based on statements by legislators and testimony presented during legislative hearings).

It is also unclear how H.B. 71 ensures that students in Louisiana public schools "understand and appreciate the foundational documents of [its] state and national government" when it makes displaying those "foundational" documents optional, and does not require that they also be printed in a large, easily readable font. La. R.S. § 17:2124(A)(9). When the Ten Commandments must be posted prominently and legibly, while the other "contextual" materials need not be visible at all, the disparity lays bare the pretext.

To the extent that Louisiana relies on *Van Orden* to justify displaying the Ten Commandments in classrooms, we have already explained that the public school classroom implicates certain protections that other contexts, like the Texas State Capital grounds, does not. *See supra* Section IV(A). The Supreme Court said as much in *Van Orden*. *See* 454 U.S. at 690–91 ("There are, of course, limits to the display of religious messages or symbols. . . . *Stone* . . . was a consequence of the 'particular concerns that arise in the context of

No. 24-30706

public elementary and secondary schools.' . . . The placement of the Ten Commandments monument on the Texas State Capitol grounds is a far more passive use of those texts than was the case in *Stone*, where the text confronted elementary school students every day." (citations omitted)).

As in *Stone*, "[i]f the posted copies of the Ten Commandments are to have any effect at all, it will be to induce the schoolchildren to read, meditate upon, perhaps to venerate and obey, the Commandments." 449 U.S. at 42. This "is not a permissible state objective under the Establishment Clause." *Id.*

*Stone v. Graham* is controlling. Under *Stone*, H.B. 71 is plainly unconstitutional. The district court did not err.

C

We also agree with the district court that, even if *Stone* were overturned tomorrow, H.B. 71 violates the Establishment Clause under *Kennedy*. Louisiana counters that the district court misapplied *Kennedy* because, under *Kennedy*, the threshold question in an Establishment Clause analysis is whether the challenged practice implicates historical hallmarks of religious establishments. We disagree.

As noted, *Kennedy* shed light on the proper standard for interpreting Establishment Clause claims, holding that "the Establishment Clause must be interpreted by 'reference to historical practices and understandings.'" 597 U.S. at 535 (quotation marks omitted). "The line that courts and governments must draw between the permissible and the impermissible has to accord with history and faithfully reflect the understanding of the Founding Fathers." *Id.* at 536–37 (citation modified) (citing *Galloway*, 572 U.S. at 577; *Schempp*, 374 U.S. at 294).

No. 24-30706

The Supreme Court then addressed the district's alternative argument—that the district's actions were justified because it "would have been guilty of coercing students to pray" if it allowed the coach to continue publicly praying on school property. *Id.* at 536. Acknowledging that "coercion . . . was among the foremost hallmarks of religious establishments the framers sought to prohibit when they adopted the First Amendment," the Court concluded there was insufficient evidence of coercion by the coach. *Id.* at 537 & n.5 (citing *Shurtleff v. City of Boston*, 596 U.S. 243, 285–88 (2022) (Gorsuch, J., concurring) (examining the historical hallmarks of an established religion)). But *Kennedy* did not adopt these "hallmarks"[23] as the exclusive Establishment Clause test and the *Shurtleff* concurrence is non-binding. *See Kennedy*, 597 U.S. at 536–37 & n.5. Louisiana conceded as much before the district court.

We applied *Kennedy* and *Galloway* in *Freedom From Religion Foundation, Inc. v. Mack.* There, plaintiffs challenged a Texas Justice of the Peace's practice of opening his court with a prayer. *Mack*, 49 F.4th at 944. We looked to *Galloway*, in which the Supreme Court upheld a town's practice of commencing its board meetings with a prayer, and we formulated the following standard to evaluate historical record evidence: Whether the challenged practice "fits within" or is "consistent with a broader tradition" at the time of the Founding or incorporation. *Id.* at 951. This analysis

_____

[23] The "hallmarks" of religious establishment include whether the government: (1) "exerted control over the doctrine and personnel of the established church"; (2) "mandated attendance in the established church and punished people for failing to participate"; (3) "punished dissenting churches and individuals for their religious exercise"; (4) "restricted political participation by dissenters"; (5) "provided financial support for the established church, often in a way that preferred the established denomination over other churches"; and (6) "used the established church to carry out certain civil functions, often by giving the established church a monopoly over a specific function." *Shurtleff*, 596 U.S. at 286 (Gorsuch, J., concurring) (citations omitted).

No. 24-30706

" depends on 'original meaning and history,' with particular attention paid to 'historical practices.'" *Id.* (citing *Kennedy*, 597 U.S. at 535)*; see Galloway*, 572 U.S. at 577 (" The Court's inquiry, then, must be to determine whether the prayer practice in the town of Greece fits within the tradition long followed in Congress and the state legislatures.").

Applying *Kennedy* and *Mack* here, the district court framed the "broader tradition" as the use of the Ten Commandments in public education, and the challenged practice as " the permanent posting of the Ten Commandments in public[] school classrooms." No one challenges that framing. Therefore, the question before us is whether the permanent posting of the Ten Commandments in public school classrooms fits within, or is consistent with, a broader tradition of using the Ten Commandments in public education.

Plaintiffs allege that "[t]here is no longstanding tradition of permanently displaying the Ten Commandments in public[] school classrooms in Louisiana or the United States more generally." They also allege that "[H.B. 71] includes false statements relating to a purported history and connection between the Ten Commandments and government and public education in the United States," including a "fabricated" quote by James Madison regarding this country's " capacity . . . to govern ourselves according to the moral principles of the Ten Commandments."

Accepting these allegations as true, the district court found that Plaintiffs adequately pleaded an Establishment Clause violation under *Kennedy*. We find no error.[24]

―――――――――――――――――

[24] Because neither we nor the Supreme Court have decided an Establishment Clause case involving the public school context since *Kennedy*, we assume without deciding

No. 24-30706

V

Lastly, Louisiana challenges the preliminary injunction as erroneously granted and overbroad.

"We review the district court's grant of [a] preliminary injunction for abuse of discretion, reviewing underlying factual findings for clear error and legal conclusions *de novo*." *Harrison v. Young*, 48 F.4th 331, 339 (5th Cir. 2022).

A preliminary injunction is proper if Plaintiffs can show "(1) a substantial likelihood of success on the merits, (2) a substantial threat of irreparable harm absent the injunction, (3) that the harm [Plaintiffs] will suffer without the injunction outweighs the cost to comply with the injunction, and (4) that the injunction is in the public interest." *Id.*

A

Louisiana argues that Plaintiffs are unlikely to succeed on the merits of their Establishment Clause claims for the same reasons asserted in its consolidated motion to dismiss: lack of subject matter jurisdiction and because H.B. 71 is constitutional under *Kennedy*.

The district court correctly found that Plaintiffs' claims are ripe, they have shown standing to bring their Establishment Clause claims, and no defendant is entitled to sovereign immunity. The district court also found that H.B. 71 violates the Establishment Clause under *Stone*, which remains good law and controlling.

Under *Kennedy* and *Mack*, the district court determined that to succeed on the merits, Plaintiffs must show that the practice at issue—

--------------------------------

that the historical framework formulated in *Mack* is applicable here, and cite *Mack* for this very limited purpose.

permanently displaying the Ten Commandments in public school classrooms—does not "fit[] within," and is not "consistent with," a broader tradition existing at the time of the founding. *Mack*, 49 F.4th at 950–51.

In support of their motion for a preliminary injunction, Plaintiffs presented the expert testimony of Dr. Steven Green, a religious and constitutional legal historian. Dr. Green testified that the public school system did not exist at the founding; rather, public education originated sometime around the late 1820s. Dr. Green also found no evidence that the Ten Commandments were permanently displayed in early American public schools. He testified that no state enacted a law allowing the display of the Ten Commandments in public schools until North Dakota did so in 1927, and that a court later stuck down the statute. *See Ring v. Grand Forks Pub. Sch. Dist. No. 1*, 483 F. Supp. 272 (D.N.D. 1980).

Dr. Green also testified about the books cited in H.B. 71's context statement. The *New England Primer*, whose initial publication predates the existence of the public school system, he explained, was primarily used in religious schools and private academies. The *McGuffey Readers* had six levels. About half referenced the Ten Commandments, and only sporadically (in approximately 4 lessons out of 200 lessons), and their prevalence lessened over time. He testified that most versions of Webster's *American Spelling Book* included no reference to the Ten Commandments. Citing his findings and a "lack of compelling counterevidence," he rebutted H.B. 71's declaration that "The Ten Commandments were a prominent part of American public education for almost three centuries," *see* La. R.S. § 17:2124(B)(3).[25] Louisiana did not present any expert testimony.

––––––––––––––––––––––––

[25] Louisiana contends that the H.B. 71 displays involve a "far *more* passive" use of the Ten Commandments than the books cited in the statute's context statement because the displays "will simply appear on a wall for students to observe or ignore as they wish."

No. 24-30706

Based on Dr. Green's testimony, the district court found a substantial likelihood that there is insufficient evidence of a broader tradition in place at the time of the founding, or within the history of public education, so as to justify H.B. 71.[26] This finding is not clearly erroneous.[27] The district court

—————————————————

But "it is no defense to urge that the religious practice[] here may be [a] relatively minor encroachment[] on the First Amendment." *Schempp*, 374 U.S. at 225.

[26] Louisiana challenges the district court's reliance on Dr. Green's testimony. It accuses the court of improperly deferring to expert testimony to resolve constitutional issues. Indeed, "an expert may never render conclusions of law." *Goodman v. Harris Cnty.*, 571 F.3d 388, 399 (5th Cir. 2009). But the legal issue presented—whether H.B. 71 violates the Establishment Clause—requires, on a motion for preliminary injunction, resolving fact issues about the Ten Commandments' role in American history. *See Kennedy*, 597 U.S. at 534–37; *see also Yoder*, 406 U.S. at 209 (looking to a party's "expert witnesses[,] scholars on religion and education," in deciding a Free Exercise claim). The district court did not abuse its discretion by relying on "the historical record compiled by the parties" to determine whether the Ten Commandments fit within this country's longstanding history and tradition. *See New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 597 U.S. 1, 25 n.6 (2022). Separately but relatedly, we decline to address Plaintiffs' argument that *Bruen* required Louisiana, not them, to carry the evidentiary burden in the historical analysis. We are satisfied that—even assuming the district court correctly assigned the burden— Plaintiffs have met it.

[27] Louisiana separately argues that H.B. 71 is consistent with the broader tradition of displaying religious imagery on "public property." It likens the H.B. 71 displays to the national seal, a proposed national seal featuring Moses, various state and municipal flags, and the "In God We Trust" motto featured on American currency. As the district court correctly concluded, under *Mack*, a court should not construe the relevant tradition too broadly. *See Mack*, 49 F.4th at 957 ("Accordingly, we ask whether Mack's particular practice is consistent with [the] tradition [of prayer before 'deliberative bodies].'"). Not only does Dr. Green's testimony establish that there is no "unbroken history" of displaying the Ten Commandments in public school classrooms, *Lynch*, 465 U.S. at 674, but as we have made clear, *supra* section IV(A), the display of religious symbols in public classrooms is patently distinguishable from the display of religious imagery in government buildings. *See also Galloway*, 572 U.S. at 590 (distinguishing *Galloway* from *Lee* where "the Court found that, in the context of a graduation where school authorities maintained close supervision over the conduct of the students and the substance of the ceremony, a religious invocation was coercive as to an objecting student," because legislative prayer did not present "an unconstitutional imposition as to mature adults, who 'presumably' are 'not readily susceptible to religious indoctrination or peer pressure'"); *Am. Legion*, 588 U.S. at

did not err in finding that Plaintiffs showed a substantial likelihood of success on the merits of their Establishment Clause claims.

## B

As to the second element, a substantial threat of irreparable harm absent the injunction, Louisiana argues that Plaintiffs cannot show any harm because they do not know what the posters will look like and therefore cannot know whether any poster will violate the First Amendment.

This argument fails for the same reasons Louisiana's ripeness argument fails. H.B. 71's minimum requirements provide sufficient details about how the Ten Commandments must be displayed. Plaintiffs have shown that those displays will cause an "irreparable" deprivation of their First Amendment rights. *See Elrod*, 427 U.S. at 373.

## C

The third element is whether the harm that Plaintiffs will suffer absent the injunction "outweighs the cost to comply with the injunction." *Harrison*, 48 F.4th at 339. "Where the State is appealing an injunction, its interest and harm merge with the public interest," the fourth element. *Book People*, 91 F.4th at 340–41.

Louisiana will "suffer[] the irreparable harm of denying the public interest in the enforcement of its laws." *Id.* at 341 (citation omitted). But it does not have a genuine "interest in enforcing a regulation that violates

---

51 n.16 (dividing Establishment Clause cases "into six rough categories" including a category involving "religious references or imagery in public monuments, symbols, mottos, displays, and ceremonies" and another category involving "religious expression in public schools"); *see also Edwards*, 482 U.S. at 583 n.4 (noting that "a historical approach is not useful in determining the proper roles of church and state in public schools, since free public education was virtually nonexistent at the time the Constitution was adopted").

federal law." *Id.* (citation omitted). On the contrary, "[i]njunctions protecting First Amendment freedoms are always in the public interest," *Opulent Life Church v. City of Holly Springs*, 697 F.3d 279, 298 (5th Cir. 2012) (brackets and citation omitted), and courts must be "particularly vigilant in monitoring compliance with the Establishment Clause in elementary and secondary schools." *Edwards*, 482 U.S. at 583–84.

The district court did not abuse its discretion by finding that Plaintiffs satisfied the preliminary injunction elements.

## D

Finally, we reject Louisiana's challenge to the district court's order that the Superintendent and BESE-member defendants provide notice of the injunction to all Louisiana public and charter schools. Louisiana's chief argument is that the notice provision is "an effort to achieve by other means an improper statewide injunction." That argument falls because nothing would prohibit a statewide injunction under these circumstances. *See Rodgers v. Bryant*, 942 F.3d 451, 458–59 (8th Cir. 2019); *Milliken v. Bradley*, 418 U.S. 717, 744 (1974) ("The controlling principle consistently expounded in our holdings is that the scope of the remedy is determined by the nature and extent of the constitutional violation." (citing *Swann v. Charlotte-Mecklenburg Bd. of Ed.*, 402 U.S. 1, 16 (1971))).

\*      \*      \*

We **AFFIRM** the district court's entry of a preliminary injunction and denial of Louisiana's consolidated motion to dismiss as to Plaintiffs' Establishment Clause claims.

No. 24-30706

James L. Dennis, *Circuit Judge*, concurring:

I join the majority opinion in full. I write separately to offer two additional bases for affirming the district court's judgment. First, the Plaintiffs have standing under settled Supreme Court precedents recognizing "offended observer" standing in Establishment Clause cases. *See, e.g.*, *Lee v. Weisman*, 505 U.S. 577 (1992); *Sch. Dist. of Abington Twp. v. Schempp*, 374 U.S. 203 (1963). Second, Louisiana vastly overstates both the holding and reach of *Kennedy v. Bremerton School District*, 597 U.S. 507 (2022). That decision did not undermine—much less overrule—*Stone v. Graham*, 449 U.S. 39 (1980). Nor did it eliminate the component parts of *Lemon v. Kurtzman*, 403 U.S. 602 (1971).[1]

I

Plaintiffs seeking to press claims in federal court face several hurdles, most basic among them the requirement that they have suffered an "injury in fact." *See Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992). For more than six decades, however, the Supreme Court has recognized that personal exposure to objectionable religious expression by the government can satisfy that requirement when the claim arises under the Establishment Clause. This "offended observer" or "exposure" theory of standing permits plaintiffs to sue based on a substantial likelihood of encountering state-sponsored religious expression. *See* Carl H. Esbeck, *Unwanted Exposure to Religious Expression by Government: Standing & the Establishment Clause*,

_____

[1] *Lemon* formalized a three-part test for evaluating Establishment Clause violations: state action is unconstitutional if it (1) lacks a secular legislative purpose; (2) has the primary effect of advancing or inhibiting religion; or (3) fosters an excessive entanglement between government and religion. 403 U.S. at 612–13. Over time, courts interpreting the second prong began asking whether a "reasonable observer" would view the government's challenged action an "endorsement" of religion, giving rise to the so-called "endorsement test." *See, e.g.*, *Cnty. of Allegheny v. Am. C.L. Union*, 492 U.S. 573, 593 (1989).

Case: 24-30706      Document: 219-1      Page: 45      Date Filed: 06/20/2025 of 50

No. 24-30706

7 Charleston L. Rev. 607, 607–08 (2013);[2] Christopher C. Lund, *A Defense of Offended Observer Standing Under the Establishment Clause*, 70 Wayne L. Rev. 111, 120–23 (2024). In this context, unwanted exposure operates as a proxy for the otherwise demanding injury-in-fact requirement. "There is [offended observer] standing where a plaintiff's status has led to being personally exposed to her government's religious expression, the message being one with which she disagrees, or she has had to assume a burden to avoid any such exposure." Esbeck, *supra* at 633.

Louisiana contends that we are free to discard offended observer standing and adopt the minority view advanced by Justices Thomas and Gorsuch—that the Supreme Court has never recognized such standing and that the doctrine lacks any basis in law. *See, e.g.*, *City of Ocala v. Rojas*, 143 S. Ct. 764 (2023) (Mem.) (Gorsuch, J., statement regarding denial of certiorari); *id.* at 765 (Thomas, J., dissenting from denial of certiorari); *Am. Legion v. Am. Humanist Ass'n*, 588 U.S. 29, 79–89 (2019) (Gorsuch, J., concurring in the judgment); *but see* Lund, *supra* at 132 (arguing that Justices Thomas and Gorsuch "treat[] standing as parasitic on the merits"); *cf. Warth v. Seldin*, 422 U.S. 490, 500 (1975) ("[S]tanding in no way depends on the merits of the plaintiff's contention that particular conduct is illegal."). Louisiana is mistaken: the Supreme Court majority has

---

[2] I agree with Professor Esbeck that the label "offended observer" is misleading because it implies a plaintiff's injury is mere offense. Esbeck, *supra* at 608 n.3. "[T]he nature of the relevant harm is not emotional or psychological offense, nor is it the intensity of the offense." *Id.* "[T]he successful plaintiff is more than a mere observer, but one who disagrees with her government's message." *Id.* On this account, the phrase "offended observer" serves as a rhetorical tool for governmental defendants used to trivialize Establishment Clause claims and to seek early dismissal for lack of standing. I use the term here only for clarity.

No. 24-30706

long recognized and applied offended observer standing in Establishment Clause cases.

In *Lee v. Weisman*, Deborah Weisman, a public high school student, objected to the inclusion of a prayer service at her upcoming graduation. 505 U.S. at 584. The Supreme Court held: "[A] live and justiciable controversy is before us. Deborah Weisman is enrolled as a student at Classical High School in Providence and from the record it appears likely, if not certain, that an invocation and benediction will be conducted at her high school graduation." *Id.* This is the High Court's clear recognition of offended observer standing. Weisman would not have had standing if she were a student at a different school or in a different state. But her substantially likely future exposure to the government-ordered prayers gave her standing to sue. *Id.* at 596–97. Lest there be any doubt, the Court's standing theory did not depend on Weisman being more than an offended observer. Nowhere does *Lee* suggest that her standing arose from the school forcing or coercing her to pray. In fact, all nine Justices unanimously agreed on this issue; even the four dissenters, who emphasized that the school did not coerce Weisman to pray, did not question her standing. *Id.* at 637–40.

*Lee* is not an anomaly. In *School District of Abington Township v. Schempp*, the Supreme Court treated standing similarly. 374 U.S. at 225 n.9. There, the Schempp family challenged a Pennsylvania law requiring students to read the Bible at the beginning of each school day as a violation of the Establishment Clause. The Supreme Court declared the Bible reading unconstitutional, even though the students could be excused without penalty. As to standing, the Court held:

> The parties here are school children and their parents, who are directly affected by the laws and practices against which their complaints are directed. These interests surely suffice to give the parties standing to complain. . . . *Compare Doremus v. Board*

No. 24-30706

> *of Education*, 342 U.S. 429 (1952), which involved the same substantive issues presented here. The appeal was there dismissed upon the graduation of the school child involved and because of the appellants' failure to establish standing as taxpayers.

*Id.*

Schempp is less explicit than *Lee*, but the Court clearly applied offended observer standing. Earlier in the opinion, the Court had already explained how the school's religious lessons "were read to [the Schempp children] at various times as part of the [school's] exercises" and "were contrary to the religious beliefs they held." *Id.* at 208. The Court then concluded the Schempp children were "directly affected" by the prayers in ways that "suffice[d] to give [them] standing to complain." *Id.* at 225 n.9. One sees the offended observer theory of standing both in *Schempp*'s self-characterization and its characterization of *Doremus*, where the Court held that plaintiffs lacked standing because the child's graduation had cut off the risk of future exposure. *Id.*; Lund, *supra* at 120–23; *see also Valley Forge Christian Coll. v. Ams. United for the Separation of Church & State*, 454 U.S. 464, 487 n.22 (1982) (explaining with approval that the students in *Schempp* had standing because they were "subjected to unwelcome religious exercises or [were] forced to assume special burdens to avoid them").

In my estimation, the Supreme Court has long approved offended observer standing. And as a court of appeals, we are not free to adopt the views of dissenting Justices over those of the Court's majority.[3] Although our

---

[3] Concomitantly, it would be most unusual to find that these Plaintiffs lack standing to challenge H.B. 71, a law that is virtually identical to the Kentucky law that the Supreme Court struck down over forty years ago in *Stone v. Graham*, 449 U.S. 39 (1980). True enough, the Supreme Court did not expressly consider whether the *Stone* plaintiffs had standing. But "[w]hile we are not bound by previous exercises of jurisdiction in cases in which our power to act was not questioned but was [approved] sub silentio, neither should

majority opinion does not rest on this ground, I am more than comfortable concluding that the Plaintiffs have offended observer standing to challenge H.B. 71 under the Establishment Clause.

## II

On the merits of the Establishment Clause claim, Louisiana argues that we can ignore *Stone v. Graham*, 449 U.S. 39 (1980) (which struck down a law like H.B. 71 for lacking a secular purpose), because *Stone* relied on *Lemon*, which Louisiana insists *Kennedy* fully abandoned. Today we correctly affirm the district court's ruling that *Stone* is controlling. Indeed, as the majority opinion explains, *Kennedy* does not mention *Stone* and "[i]t is the Supreme Court's 'prerogative alone to overrule one of its precedents.'" *Ante*, at 31 (quoting *Bosse v. Oklahoma*, 580 U.S. 1, 3 (2016)).

But even setting aside our lack of authority to overrule *Stone*, I write further to highlight the scholarship of Professors Lupu and Tuttle, who argue that many courts and commentators have overstated *Kennedy*'s significance. *See* Ira C. Lupu & Robert W. Tuttle, *The Ten Commandments in Louisiana Public Schools: A Study in the Survival of Establishment Clause Norms*, 100 Chi.-Kent L. Rev. (forthcoming 2025). In their view, *Kennedy* repudiated only the endorsement test—an offshoot of *Lemon*'s second prong (*supra* n.1)—and left intact the broader framework of Establishment Clause doctrine: the requirement of a secular legislative purpose, the prohibition on policies whose primary effect advances religion, and the concern about excessive entanglement between church and state. As they note, those

---

we disregard the implications of an exercise of judicial authority assumed to be proper for over 40 years." *Brown Shoe Co. v. United States*, 370 U.S. 294, 307 (1962) (citations omitted).

principles "do not originate with *Lemon*," and the Supreme Court has not repudiated them.

Take, for example, *Schempp*, the Court's seminal school prayer case decided nearly a decade before *Lemon*. There, the Supreme Court held that "to withstand the strictures of the Establishment Clause there must be a secular legislative purpose . . . ." 374 U.S. at 222 (first citing *Everson v. Board of Education*, 330 U.S. 1 (1947); and then citing *McGowan v. Maryland*, 366 U.S. 420, 442 (1961)). That foundational holding still binds us. Unless *Schempp* and its origins are overruled—relief that Louisiana has not sought at any point in this litigation—the inquiry into the purpose of a state-sponsored religious display remains mandatory. Abandoning *Stone* would mark a first and striking step toward unraveling school prayer cases like *Schempp*, which rest on concerns about state-sponsored indoctrination of young, impressionable, and captive public-school students.

Louisiana's mistaken reliance on *Kennedy* as overruling *Stone* underscores the point. *Kennedy* turned not on state action, but on whether Coach Kennedy's personal post-game prayers were protected private speech. The Court concluded they were, and that the school district's Establishment Clause concerns could not justify restricting his free exercise. The Ten Commandments display at issue here, by contrast, is indisputably state action, undertaken for religious reasons. Still, Louisiana argues that *Kennedy* swept away *Lemon* entirely and, with it, *Stone*, replacing the existing framework with a singular focus on history and tradition.

That reading goes too far. True, *Kennedy* states that "this Court long ago abandoned *Lemon* and its endorsement test offshoot." 597 U.S. at 510. But only the second part of that sentence is fully supported by the opinion itself. The only part of *Lemon* the Court addressed was the endorsement test. That is, whether a reasonable observer would perceive Coach Kennedy's

No. 24-30706

prayers as government sponsorship of religion. *Kennedy* did not revisit the secular purpose requirement, the analysis of primary effects, or the concern with excessive entanglement. And again, these requirements predate *Lemon*. " *Lemon*'s component parts thus remain alive, and function in a variety of contexts, even if citations to *Lemon* now will disappear." Lupu & Tuttle, *supra*.

  *Stone* still stands. H.B. 71 falls.